[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
{¶ 1} Defendant-appellant, Raymond Mason, III ("Mason"), appeals from the judgment of the Franklin County Court of Common Pleas entered upon a jury verdict in favor of plaintiffs-appellees and cross-appellants Jennifer Rothenbusch-Rhodes ("Mrs. Rhodes") and her husband Thomas Rhodes ("Rhodes").
 {¶ 2} The Rhodes and Mason are neighbors who reside on adjacent properties located on Havens Road in Blacklick, Ohio. Mason owned an adult Bull-Mastiff dog named Hooch.
 {¶ 3} Rhodes has a workshop behind his house which he uses in his contracting business. On March 15, 2001, with Hooch alongside, Mason paid a visit to the Rhodes property. As Mason was heading towards Rhodes' workshop, Mrs. Rhodes exited her house with her new puppy Taz. Hooch and Taz had never met so Mrs. Rhodes picked up Taz out of concern for how Hooch might react. Mason assured her that Hooch would not hurt the puppy, so Mrs. Rhodes put Taz down and for a few moments she played with the dogs. Mrs. Rhodes threw a stick for Taz to fetch and Hooch ran along with Taz on the first two or three occasions and then lost interest in the game. At that time, Mrs. Rhodes petted Hooch without incident.
 {¶ 4} Mason went into the workshop to see Rhodes while Mrs. Rhodes was still playing with the dogs outside. Several of Rhodes' employees were present at the workshop at that time.
 {¶ 5} After Taz had tired of playing "fetch," Mrs. Rhodes entered the workshop and both dogs followed her in. As she entered the building, Mrs. Rhodes smelled a skunk odor. While Rhodes and Mason were sitting at a conference table conversing, Mrs. Rhodes picked up Taz to smell him, but the odor was not on Taz so she put him down.
 {¶ 6} Hooch was sitting near Mrs. Rhodes. Mrs. Rhodes bent down, smelled Hooch and stood up. As she stood up, Hooch growled, jumped up and bit Mrs. Rhodes on the face. Rhodes grabbed some paper towels and placed them on Mrs. Rhodes' face which was bleeding profusely.
 {¶ 7} Mrs. Rhodes testified at trial that immediately after she was bit, Mason said, "I forgot to tell you, the dog doesn't like anyone around his face." (Tr. 220.) Rhodes testified that immediately after the bite, Mason said he was afraid to grab the dog for fear that it would bite him or someone else.
 {¶ 8} On cross-examination, Mason responded to questioning as follows:
Q. After Jen[n]ifer was bitten, do you remember telling her that Hooch doesn't like to have people down around his face?
A. What I said was, "You shouldn't be" — "You don't get in dog's faces. It's not a good idea with a dog you don't know that well."
(Tr. 76.)
 {¶ 9} As Mr. and Mrs. Rhodes were leaving for the hospital emergency room in their truck, Mason asked that they tell the hospital personnel that Mrs. Rhodes had been bitten by her dog. Mason testified that he made this request because he knew Hooch was "in big trouble" as it would be his second reported bite in a ten month period.
 {¶ 10} Prior to the dog bite on March 15, 2001, the Rhodes were unaware that Hooch had a history of attacking and biting people. Mason had never informed them of any of Hooch's incidents with other people and Mrs. Rhodes testified that prior to her being bitten, she had no fear of Hooch and no concern for her safety around him. Hooch had never snapped or growled at Mrs. Rhodes prior to March 15, 2001. The Rhodes had several cats that stayed in their screened porch and Hooch had never attempted to go after them.
 {¶ 11} In January 2001, Rhodes began a contracting project for Mason that required Rhodes to be on Mason's property to supervise his employees. Prior to March 15, 2001, Rhodes had contact with Hooch 15 to 20 times while he was on Mason's property performing work. During that time, Hooch never growled at or attempted to bite Rhodes or any of his employees.
 {¶ 12} Prior to March 15, 2001, Mason had brought Hooch over to the Rhodes' property five or six times and during those occasions Hooch had never growled or displayed any aggressive tendencies towards the Rhodes.
 {¶ 13} On August 13, 2000, some seven months prior to the dog bite incident at issue here, Hooch bit Cheryl Allen on her arm and shoulder. Cheryl Allen received medical treatment for the bite and reported the incident to the Franklin County Board of Health. Mason paid for the medical bills. The agency conducted an investigation of the biting incident and quarantined the dog for a ten day period to verify that it was not rabid.
 {¶ 14} Cheryl Allen was bitten while Hooch was being kept by a friend of Mason's, Sue Knight. Sue Knight and Cheryl Allen were neighbors. On August 13, 2000, Sue Knight was out in her yard when Cheryl Allen came over to visit. As they were talking, Sue Knight's three or four year old daughter walked Hooch out of the house on a leash toward Cheryl Allen who then became entangled in the leash. When Cheryl Allen bent down to unwrap herself from the leash, Hooch jumped up and bit her.
 {¶ 15} Mason was aware of several other incidents involving Hooch prior to the March 15, 2001 incident at issue here.
 {¶ 16} The earliest incident occurred sometime in 1999, when Mason resided in Clintonville before moving to Blacklick. That incident occurred when several teenagers walked uninvited through Mason's unfenced front yard. Hooch growled and chased the teenagers, scratching one of them. Some type of complaint was filed over the incident and Mason and the boy's father appeared at a proceeding to resolve the matter.
 {¶ 17} Another incident occurred in Spring 2000 on Mason's property after he moved his residence to Blacklick. At that time, a good friend, Debra Cowan, was caring for Hooch for an extended period of time while Mason was out of state. Debra Cowan walked with Hooch to the mailbox while a lawn treatment worker was working in the backyard. Hooch took off to the backyard and Debra Cowan followed. Debra did not see what happened, but the "yardman had a strange look on his face" and failed to pick up the check. (Tr. 320-321.). About one month later, Debra Cowan opened a letter from the lawn treatment company stating that their worker had been bitten by the dog and consequently the company would no longer be treating Mason's lawn.
 {¶ 18} Another incident occurred on August 4, 2000, when Mason took Hooch to see veterinarian Kristy Clay, D.V.M. During the examination, Hooch "nipped" Dr. Clay on the lip, "not enough really to draw blood, but enough to swell, get a little red." (Tr. 26.) Dr. Clay did not seek medical attention and did not report the incident as a bite. Dr. Clay wrote in Hooch's chart "bit me in face, unsure if playful or not?" (Tr. 23.) Dr. Clay felt that Hooch was "unpredictable" and thus gave the file a red dot to alert her staff. However, Mason was not told that Hooch's file received the red dot.
 {¶ 19} Another incident occurred during the winter months just prior to March 15, 2001. Joseph Bryan was a contractor hired by Mason to resurface the cement floor of his garage that was being remodeled. The incident occurred when Mason and Hooch were in the garage while Bryan and his crew were there to finish the job. After petting Hooch, Bryan turned his back on him. Hooch then lunged up and nipped Bryan on the right buttock. Bryan testified that Mason said after the incident that the dog bites when he does not know the person. Bryan protested to Mason that the dog did know him and he asked Mason to remove the dog from the work area. Mason complied with the request.
 {¶ 20} The emergency room records of March 15, 2001 show that Mrs. Rhodes lost a two centimeters by two centimeters portion of her lip as a result of Hooch's attack. The emergency room physician consulted with a plastic surgeon and was advised not to sew the wound. The day following the injury, Mrs. Rhodes met with a cosmetic surgeon, Gregory E. Morrison, M.D., who observed that Mrs. Rhodes sustained an evulsion and laceration of her lip.
 {¶ 21} Because the laceration was rather "jagged" and was healing with a substantial amount of scar tissue, Dr. Morrison then recommended scar revision surgery which he performed on July 19, 2001.
 {¶ 22} At a March 19, 2002 follow-up visit following the surgery, Dr. Morrison determined that there still remained a "hypersensitive, puffy scar with erythema or the redness that often associates [with] that." During testimony on May 1, 2002, Dr. Morrison stated that he and Mrs. Rhodes were considering further treatments including "dermabrasion" and a "Kenalog injection." (Tr. 31-32.)
 {¶ 23} On June 27, 2001, Mr. and Mrs. Rhodes filed an action for damages against Mason in the Franklin County Court of Common Pleas. The complaint alleged that Mason, as the dog's owner, is liable as a matter of statute and common-law for the injuries sustained by Mrs. Rhodes when she was bitten by Hooch. The complaint alleged that Mason failed to control and restrain a known dangerous animal and that Mason's conduct in that regard "was wanton and reckless disregard for the safety of others, including Plaintiff, justifying an award of punitive damages." Rhodes also alleged loss of consortium due to Mrs. Rhodes' injuries. In his answer, Mason denied all liability, both compensatory and punitive.
 {¶ 24} On March 12, 2002, Mason moved for partial summary judgment as to punitive damages. In his memorandum in support, Mason stated that he concedes legal liability upon the statutory cause of action under R.C. 955.28. In support of summary judgment as to punitive damages, Mason submitted the deposition testimony of both plaintiffs and defendant. Plaintiffs opposed the motion for partial summary judgment.
 {¶ 25} On March 12, 2002, the trial court denied defendant's motion for partial summary judgment in a written decision.
 {¶ 26} On July 19, 2002, plaintiffs filed a motion in limine that requested the trial court to bar all evidence from defendant showing that Hooch had been euthanized, or, in the alternative, to allow rebuttal evidence challenging whether Hooch was actually euthanized. Defendant responded to plaintiffs' motion. Defendant conceded that evidence of the dogs euthanization was not relevant to compensatory damages but vigorously insisted that the evidence was relevant to punitive damages. Defendant argued that if the jury is left to believe that Mason still owns the dog, the jury would be more inclined to award punitive damages.
 {¶ 27} On July 26, 2002, defendant filed a motion in limine requesting that the trial court bar any references to the deposition testimony of veterinarian Susan Prescott, during voir dire and counsel's opening statement. Dr. Prescott had examined Hooch on April 10, 2001, three and one-half weeks after he had bitten Mrs. Rhodes. In his memorandum in support, defendant argued that Dr. Prescott's testimony was irrelevant. He also argued under Evid.R. 403(A) that any probative value of the deposition was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury.
 {¶ 28} The action came on for trial to a jury beginning August 6, 2002. On the day of trial, prior to voir dire, the trial court met with counsel in chambers. Thereafter, the court and counsel put on the record the results of those discussions.
 {¶ 29} Noting that her rulings on the motions in limine were only preliminary at that point, the trial court ruled that Dr. Prescott's testimony would be admissible. The trial court also preliminarily ruled that defendant could present his evidence that Hooch had been euthanized, but plaintiff would be allowed to rebut that evidence by direct and cross-examination of witnesses.
 {¶ 30} At the end of plaintiffs' evidence, defendant moved for a directed verdict as to punitive damages. Plaintiffs opposed the motion. The trial court overruled defendant's motion. At the close of defendant's evidence, defendant renewed his motion for directed verdict. The trial court again overruled the motion.
 {¶ 31} The jury returned verdicts in favor of plaintiffs. The jury awarded Mrs. Rhodes compensatory damages in the amount of $150,000, and punitive damages in the amount of $100,000. The jury awarded Rhodes $2,500 in compensatory damages on his claim for loss of consortium.
 {¶ 32} On August 20, 2002, the trial court entered judgment on the verdicts.
 {¶ 33} Following the return of the verdicts, plaintiffs moved for prejudgment interest. Defendant opposed the motion. On September 5, 2002, the court entered judgment denying plaintiffs' motion for prejudgment interest.
 {¶ 34} Thereafter, defendant timely filed a notice of appeal and plaintiffs have timely filed a cross-appeal.
 {¶ 35} Defendant presents five assignments of error as follows:
FIRST ASSIGNMENT OF ERROR:
The trial court erred in denying the Defendant's Motion for Partial Summary Judgment directed to the issue of liability for punitive damages. * * *
SECOND ASSIGNMENT OF ERROR:
The trial court erred in denying the Defendant's Motions for Directed Verdict on the issue of liability for punitive damages, asserted during trial. * * *
THIRD ASSIGNMENT OF ERROR:
The trial court erred in denying the Defendant's Motions In Liminie and in overruling the Defendant's objections to the presentation of evidence during trial, relating to events and conversations or communications that occurred subsequent to the date of injury sustained by the Plaintiff Jennifer Rothenbusch-Rhodes; i.e. the trial court (a) erred in permitting the presentation of evidence of statements made by the Defendant Raymond Mason, III, subsequent to March 15, 2001, regarding his potential response to a prospective future ruling of the Board of Health concerning the disposition of the dog, (b) erred in permitting presentation of evidence of testimony given during the Franklin County Board of Health hearing in April 2001 to determine whether the dog Hooch was to be declared vicious and be destroyed, and (c) erred in allowing presentation of evidence concerning the events which took place at the offices of Veterinarian Susan Prescott in April 2001 and her statements, recommendations, and communications sent to the Franklin County Board of Health. * * *
FOURTH ASSIGNMENT OF ERROR:
The trial court erred in refusing to give additional instructions to the jury to clarify the standards to be applied in interpreting the terms: "conscious disregard" and "great probability" as those terms are found in the legal standard for determining liability for punitive damages, and which supplementary instructions of law were specifically requested by counsel for the Defendant. * * *
FIFTH ASSIGNMENT OF ERROR:
The trial court erred in refusing to further instruct the jury on the issue of the legal definition of "conscious regard" after the jury had specifically sent to the Court and counsel a question asking for the legal definition of such during their deliber-ations, and the trial court erred in again at that time refusing to give further instruction to the jury on that issue as specifically requested again by counsel for the Defendant. * * *
 {¶ 36} Preliminarily, we note that, in Ohio, a person who is injured or whose property is damaged by a dog can initiate both statutory and common-law actions for damages. Flint v. Holbrook (1992),80 Ohio App.3d 21, 25, citing Warner v. Wolfe (1964), 176 Ohio St. 389,393. The statute, R.C. 955.28, imposes strict liability upon the owner, keeper or harborer of a dog "for any injury, death, or loss to person or property that is caused by the dog." Flint.
 {¶ 37} The issues to be determined under the statute are the ownership or keepership of the dog, whether the dog's actions were the proximate cause of the damage, and the monetary amount of damages. Flint at 25, citing Hirschauer v. Davis (1955), 163 Ohio St. 105, 109.
 {¶ 38} Under common-law, a plaintiff suing for damages inflicted by a dog must show that the defendant owned or harbored the dog, that the dog was vicious, that the defendant knew of the dogs viciousness, and that the defendant was negligent in keeping the dog. Flint at 25-26, citing McIntosh v. Doddy (1947), 81 Ohio App. 351, 359. Also, in a common-law tort action against the owner of a vicious dog, punitive damages may be awarded. Tynan v. Hanlon (1959), 110 Ohio App. 77, 79, citing Hayes v. Smith (1900), 62 Ohio St. 161.
 {¶ 39} Pertinent to the punitive damages issue here is the syllabus of Preston v. Murty (1987), 32 Ohio St.3d 334, which states:
Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.
(Emphasis sic.)
 {¶ 40} It is the second type of malice set forth in Preston that is at issue. There was no claim below that appellant's conduct involved hatred, ill will or a spirit of revenge toward appellees.
 {¶ 41} The syllabus of Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, further clarifies the malice claim at issue here:
Absent proof of a defendant's subjective knowledge of danger posed to another, a punitive damages claim against that defendant premised on the "conscious disregard" theory of malice is not warranted.
 {¶ 42} Appellant's first and second assignments of error challenge the trial court's denial of his motion for partial summary judgment and for a "directed verdict on the issue of liability for punitive damages." Because those assignments of error are interrelated, we shall address them together.
 {¶ 43} Civ.R. 50(A)(4) provides for a directed verdict as follows:
When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
 {¶ 44} On a motion for directed verdict, the trial court is confronted solely with a question of law: Was there sufficient material evidence presented at trial on the issue to create a factual question for the jury? Malone, supra, at 445. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon such motion. Posin v. A.B.C. Motor Court Hotel (1976),45 Ohio St.2d 271, 275; Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, 67-68. This court reviews the motion for a directed verdict de novo. McConnell v. Hunt Sports Ent. (1999), 132 Ohio App.3d 657,686-687.
 {¶ 45} On his motion for directed verdict, appellant argued that appellees had failed to present sufficient evidence showing that appellant had a conscious disregard for the safety of Mrs. Rhodes because: (1) it was largely undisputed that the history of Mrs. Rhodes' prior contacts with Hooch had been "entirely friendly" and Mrs. Rhodes herself testified that she never feared Hooch prior to being bitten; and (2) allegedly all the prior incidents upon which appellees rely to show that appellant had knowledge of Hooch's dangerous nature involved persons who were strangers to Hooch and who came upon the property where Hooch lived or was being cared for: with the exception of the examination by veterinarian Dr. Clay which occurred at the veterinarian's office. Here, appellant points out that veterinary examinations are stressful to all dogs and that Dr. Clay was unsure if Hooch was being playful.
 {¶ 46} The underlying premise of appellant's argument is that he had a reasonable basis to believe that his dog posed no danger to Mrs. Rhodes because: (1) Mrs. Rhodes' relationship with the dog had been friendly; and (2) because allegedly the dog had only exhibited aggressive behavior towards strangers who had come upon the property where the dog lived or was being cared for, with the exception of the incident at Dr. Clay's office.
 {¶ 47} Appellant's argument in effect asks this court to construe the evidence most strongly in favor of appellant rather than most strongly in favor of appellees as Civ.R. 50(A)(4) requires. When the evidence is construed most strongly in favor of appellees, Civ.R. 50(A)(4) requires the trial court to deny appellant's motion for a directed verdict. Clearly, based upon Hooch's history of aggressive behavior prior to biting Mrs. Rhodes and the statements attributed to appellant on March 15, 2001, immediately after Mrs. Rhodes was bitten, reasonable minds could conclude that appellant had a conscious disregard for the rights and safety of appellees that had a great probability of causing substantial harm. Apparently, appellant seeks to second-guess who will be the victim of Hooch as a defense to any finding of conscious disregard, a unique and untenable argument in our view.
 {¶ 48} Summary judgment is appropriate when the movant demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, said party being entitled to have the evidence construed most strongly in his favor. Turner v. Turner (1993), 67 Ohio St.3d 337,339-340; Bostic v. Connor (1988), 37 Ohio St.3d 144, 146; Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66. The moving party bears the burden of proving no genuine issue of material fact exists. Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, 115.
 {¶ 49} When reviewing a decision on summary judgment, we apply the same standard as employed by the trial court. Ruscilli v. Ruscilli (1993), 90 Ohio App.3d 753, 755.
 {¶ 50} As previously noted, in support of appellant's motion for partial summary judgment, appellant submitted the deposition transcript of appellees and himself. Appellant's theory as to why summary judgment was appropriate was essentially the same as the one he used to support his motion for direct verdict. That is, appellant emphasized that Mrs. Rhodes' relationship with Hooch had been entirely friendly prior to March 15, 2001, and appellant argued that Hooch had only exhibited aggressive behavior towards strangers who had come upon the property where he lived or where he was being cared for, with the exception of his behavior at Dr. Clay's office.
 {¶ 51} Appellant's argument in support of partial summary judgment in effect asked the trial court to construe the evidence most strongly in favor of appellant rather than most strongly in favor of appellees as Civ.R. 56 requires. Clearly, the trial court appropriately denied appellant's motion for partial summary judgment on the issue of punitive damages.
 {¶ 52} Appellant's first and second assignments of error are overruled.
 {¶ 53} In his third assignment of error, appellant claims prejudice from the admission of evidence regarding events that occurred subsequent to the March 15, 2001 dog bite.
 {¶ 54} At trial, the deposition testimony of veterinarian Susan Prescott D.V.M., was admitted over the objection of appellant. Also, as previously noted, appellant had filed a motion in limine regarding Dr. Prescott's deposition testimony.
 {¶ 55} On April 10, 2001, three and one-half weeks after Hooch had bitten Mrs. Rhodes, Mason took his dog to Dr. Prescott's office for an examination and consultation. The visit to Dr. Prescott was prompted by a letter Mason had received from the Franklin County Board of Health ordering him to appear at a hearing to determine whether Hooch would be declared a "vicious dog" under the statute. A large part of Dr. Prescott's practice involves large dogs. Some of her practice involves assisting people having problems with aggressiveness in their dogs.
 {¶ 56} Prior to examining Hooch, Dr. Prescott and Mason had a lengthy discussion. Mason told Dr. Prescott that he had come to her to find out what could be done to prevent Hooch from being euthanized by order of the board of health. He informed Dr. Prescott that Hooch had bitten him and growls at him at home, but Dr. Prescott did not document the details of the bite. Neutering was discussed and Mason agreed to have Hooch neutered or castrated to reduce the dog's level of testosterone.
 {¶ 57} Dr. Prescott also explained to Mason the "dominance aggression problem" that can develop between a dog and its owner. According to Dr. Prescott, when a dog has a dominant personality and the owner fails to show dominance, the dog will view the owner as subservient.
 {¶ 58} Hooch was placed on an examination table after receiving a face muzzle. Dr. Prescott and her assistant patted Hooch on the head to show dominance to the dog. Hooch was growling during the entire examination when he suddenly jumped off the examination table towards Dr. Prescott's assistant to bite her. Dr. Prescott intervened to get her assistant out of Hooch's way. Dr. Prescott then said to Mason: "Tell him the command down." (Tr. 21.) Mason gave the command five times before the dog slowly started going down to the floor. Dr. Prescott thought it was significant that Mason did not reach for the dog's leash, but just stood on the side and told the dog "down." (Tr. 21.) Dr. Prescott decided to conclude the examination because she felt that it was too dangerous to continue.
 {¶ 59} An appointment had been made for the neutering to be done two days later. However, in the interim, Dr. Prescott decided that she should not neuter the dog. According to Dr. Prescott, she felt that she could not put the dog under anesthesia without a significant risk of harm to herself and her assistant. She also felt that, based upon Mason's relationship with his dog, it could never be made safe for the public. Dr. Prescott then sent a letter to Mason explaining her decision about Hooch. Dr. Prescott also sent a letter to the Franklin County Board of Health regarding her assessment of Hooch and his owner.
 {¶ 60} According to appellant, Dr. Prescott's deposition testimony was irrelevant because it related to events that occurred subsequent to the March 15, 2001 dog bite at issue. Alternatively, appellant asserts that, even if the deposition testimony was relevant, the trial court should have excluded it under Evid.R. 403(A) which states:
Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. (Emphasis sic.)
 {¶ 61} According to appellant, the deposition testimony was prejudicial because the jury would be inclined to improperly attribute Hooch's behavior at Dr. Prescott's office to appellant's state of knowledge prior to the March 15, 2001 dog bite at issue.
 {¶ 62} To begin, we disagree with appellant's assertion that Dr. Prescott's deposition testimony was irrelevant simply because it related to events that occurred subsequent to the March 15, 2001 dog bite at issue. Dr. Prescott's deposition testimony was relevant to show appellant's relationship to his dog as it probably existed only three and one-half weeks before. There was no evidence showing that appellant's relationship with his dog had changed between the day his dog bit Mrs. Rhodes and the day it was examined by Dr. Prescott.
 {¶ 63} Dr. Prescott's deposition testimony presented a unique perspective from an expert as to appellant's inability to adequately command his own dog. That inability would, in all probability, have existed prior to Hooch's biting of Mrs. Rhodes. Evidence that appellant feared his own dog, and by inference that appellant knew that he feared his own dog, was probative to show conscious disregard for the safety of Mrs. Rhodes on the issue of punitive damages.
 {¶ 64} While it is always possible that a jury could confuse the relevancy of Dr. Prescott's testimony and improperly attribute Hooch's behavior during the veterinarian's examination to appellant's state of knowledge on March 15, 2001, the probative value of Dr. Prescott's testimony was not substantially outweighed by the probability that the jury would misunderstand its relevance. Thus, we reject appellant's claim that the trial court abused its discretion by refusing to exclude Dr. Prescott's deposition testimony under Evid.R. 403(A).
 {¶ 65} As previously noted, prior to trial, appellees filed a motion in limine requesting that the trial court bar all evidence from appellant showing that Hooch had been euthanized, or, in the alternative, allow rebuttal evidence challenging whether Hooch was actually euthanized. In opposition to appellees motion in limine, appellant argued that evidence of the dog's euthanization was relevant to the punitive damages issue.
 {¶ 66} On the day of trial, prior to voir dire, the trial court preliminarily ruled on the record that appellant would be permitted to present evidence that he had euthanized his dog and appellees would be allowed to rebut that evidence by direct and cross-examination of witnesses.
 {¶ 67} In his third assignment of error, appellant contends that the evidence appellees presented in rebuttal to appellant's evidence of the dog's euthanization was prejudicial and should have been excluded under Evid.R. 403(A).
 {¶ 68} By way of background to this issue, the Franklin County Board of Health had given notice of a hearing to be held on May 8, 2001 to determine whether Hooch should be declared vicious or dangerous. On May 8, 2001, the board met with the parties and their counsel, but granted a continuance of the hearing until June 12, 2001 at Mason's request. However, on May 8, 2001, the board ordered that Hooch be surrendered to the Franklin County Department of Animal Control within 24 hours to be held there until June 12, 2001. Mason never did surrender Hooch to animal control as ordered.
 {¶ 69} During appellees' case, Mason was called as a witness to testify on cross-examination. During cross-examination, Mason testified that he had Hooch euthanized on May 9, 2001, and that he buried his dog in his backyard that same day. Mason also admitted that the previous owner of Hooch, Debra Cowan, who then lived in Virginia, had visited Mason on May 9, 2001. Mason denied that Debra Cowen took Hooch with her back to Virginia.
 {¶ 70} Appellees then called Sonya Friebis to the witness stand. Ms. Friebis was Dr. Prescott's receptionist at the time Mason brought Hooch to Dr. Prescott for an examination and consultation. Ms. Friebis testified that on April 11, 2001, Mason called the offices of Dr. Prescott and she took the call. Mason was "irate and upset" that Dr. Prescott had cancelled the neutering. According to Ms. Friebis, "He told me if they tell him the dog is to be euthanized, the dog will disappear." (Tr. 97.)
 {¶ 71} Appellees also called two employees and a patron of the Granville Street Tavern. Those three witnesses testified that within several days of Mrs. Rhodes having been bitten by Hooch, Mason visited the tavern and was talking about the incident. The tavern manager, Cindy Disbennett, testified that Mason stated to her that he "would make the dog disappear before anyone would ever make him put the dog down." (Tr. 107.)
 {¶ 72} Appellant presented the deposition testimony of veterinarian Clyde Alloway, D.V.M., whose office is located in Belpre, Ohio, in Washington County. Dr. Alloway testified that on May 9, 2001, he euthanized a Bull-Mastiff dog for Mason who had brought a dog weighing an estimated 130 to 150 pounds in a van to his office in Belpre. Dr. Alloway testified that he did not actually weigh the dog but simply estimated the weight. Dr. Alloway testified that he had never met Mason or Hooch before that day.
 {¶ 73} Mason testified on direct examination that he had Hooch euthanized by Dr. Alloway and that he then returned the dog's body to Blacklick for burial in the woods behind his own property. There were no witnesses to the dog's burial other than Mason.
 {¶ 74} According to appellant, appellees' evidence is irrelevant regarding statements he made at the Granville Street Tavern and to Dr. Prescott's receptionist to the effect that the dog would "disappear" if the board of health ordered euthanization. Appellant additionally argued that, even if that evidence has some relevancy to the issues to be tried, it was not admissible under Evid.R. 403(A) because its probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 {¶ 75} To begin, appellant is in no position to argue the irrelevancy of his statements that he would make the dog "disappear." It was appellant who sought to introduce evidence that he had euthanized his dog, calling it highly relevant. Moreover, the record shows that the trial court made it clear that if appellant insisted on introducing evidence that the dog had been euthanized, appellees would be allowed to present evidence tending to prove that the dog had not been euthanized. Appellant had every opportunity to weigh the consequences of his presenting evidence that he had euthanized the dog, knowing that his credibility was subject to serious challenges. As appellees put it here, regardless of the relevancy of the evidence regarding euthanization, appellant "opened the door" for appellees evidence to show that the dog had not been euthanized. Even if it can be argued that all evidence regarding euthanization was irrelevant to any issue at trial, the doctrine of "curative admissibility" permitted appellees to introduce their evidence showing that euthanization probably did not occur. See State v. Davis (Nov. 21, 1996), Franklin App. No. 96APC04-524.
 {¶ 76} With respect to appellant's argument under Evid.R. 403(A), we find that the probative value of appellees' evidence was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Again, a key factor here is that appellant understood the consequences of his insistence that he be permitted to introduce evidence of the dogs actual euthanization. Appellant under-stood that the dog's actual euthanization would become a contested factual issue.
 {¶ 77} Appellant's third assignment of error is overruled.
 {¶ 78} Appellant's fourth and fifth assignments of error are interrelated and shall thus be addressed together.
 {¶ 79} The trial court gave the following charge to the jury regarding punitive damages:
Punitive damages may be awarded against the Defendant as punishment to discourage others from committing similar wrongful acts. You are not required to award punitive damages to the Plaintiff, and you may not do so unless you find by the greater weight of the evidence that the Defendant acted with actual malice.
Actual malice is a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.
Substantial means major, of real importance or of great significance and not trifling or small.
(Tr. at 487-488.)
 {¶ 80} The above charge is taken from the syllabus of Preston, supra. Nevertheless, appellant argued at trial that the charge was inadequate on the issue of punitive damages. Appellant asked the trial court to give additional instructions taken verbatim from the opinion of Preston:
* * * Since punitive damages are assessed for punishment and not compensation, a positive element of conscious wrongdoing is always required. This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior.
A second principle inherent in the award of punitive damages is that something more than mere negligence is always required. * * * This concept is reflected in the use of such terms as "outrageous," "flagrant," and "criminal." The concept requires a finding that the probability of harm occurring is great and that the harm will be substantial. A possibility or even probability is not enough as that requirement would place the act in the realm of negligence. A requirement of substantial harm would also better reflect the element of outrage required to find actual malice.
Id. at 335-336.
 {¶ 81} During deliberations, the jury sent the following written question to the trial court:
"Is there a legal definition for conscious disregard that we should be using? If so, please offer a definition."
(Tr. at 499.)
Thereupon, the court returned the following answer:
"You have all the jury instructions applicable."
Id.
 {¶ 82} In essence, appellant contends that the trial court erred by refusing to give the instructions requested by appellant. According to appellant, the terms "conscious disregard" and "great probability" needed further clarification from the trial court and appellant's additional instruction taken from the opinion in Preston, would have satisfied that need. We disagree.
 {¶ 83} A trial court must charge a jury with instructions that are a correct and complete statement of the law. Marshall v. Gibson (1985),19 Ohio St.3d 10, 12.
 {¶ 84} If taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled. Wozniak v. Wozniak (1993), 90 Ohio App.3d 400,410.
 {¶ 85} As previously noted, the trial court's instruction on punitive damages is taken from the syllabus of Preston, supra. The syllabus is a correct and complete statement of the law. There was no need for the trial court to give additional instructions based upon verbatim language from the body of the Preston court opinion. Moreover, the fact that the jury requested a definition for "conscious disregard" does not require this court to conclude that an additional instruction was required. These words are relatively simple and counsel had the opportunity to argue to the jury the application of their version of the facts to that legal element.
 {¶ 86} Appellant's fourth and fifth assignments of error are overruled.
 {¶ 87} For their cross-appeal, plaintiffs present the following single assignment of error:
The Trial Court Abused Its Discretion In Failing To Award Prejudgment Interest From Date Of Injury, On The Compensatory Damages Portion Of The Jury Award. * * *
 {¶ 88} For the reasons that follow, we overrule plaintiffs' single assignment of error.
 {¶ 89} R.C. 1343.03(C) states:
Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.
 {¶ 90} In the syllabus of Kalain v. Smith (1986),25 Ohio St.3d 157, the court held:
A party has not "failed to make a good faith effort to settle" under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer.
 {¶ 91} The Kalain syllabus was reiterated with approval of the court in Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638,658-659. The Moskovitz court noted that the effect of Kalain is to place the burden of proof on the party seeking prejudgment interest. Moskovitz at 659. Accordingly, it is incumbent on the party seeking an award of prejudgment interest to present evidence of a written (or something equally persuasive) offer to settle that was reasonable considering such factors as the type of case, the injuries involved, applicable law, defenses available, and the nature, scope and frequency of efforts to settle. Id.
 {¶ 92} The trial court succinctly set forth its factual findings supporting its decision to deny plaintiffs' motion for an award of prejudgment interest. The parties to this appeal do not challenge the trial court's factual findings. According to the trial court:
* * * The facts relevant to this issue are as follows. This lawsuit was filed on June 27, 2001. Nearly a year later, on May 13, 2002, the Court denied Defendant's Motion for Summary Judgment on the issue of punitive damages. Between those two dates, the parties engaged in minimal settlement discussions. Plaintiffs place the blame on Defendant claiming that he refused to discuss any type of settlement involving punitive damages until the Court had ruled on a motion for summary judgment on the issue of punitive damages.
However, Defendant's counsel, Thomas J. Keener, asserts that he attempted to discuss settlement with Plaintiffs' counsel, Charles, Bendig, on three or four occasions and was informed each time that Plaintiffs were not in the position to present a demand that had a reasonable chance of success and that Plaintiffs were angry over the incident. * * * Mr. Bendig further informed Mr. Keener that Plaintiffs' position regarding settlement was influenced by their claim for punitive damages and that until the issue of punitive damages was tested by summary judgment, the parties were not likely to make any progress toward settlement. * * *
Therefore, on March 12, 2002, Defendant filed a Motion for Summary Judgment on the issue of punitive damages. Also on that date, Mr. Keener informed Mr. Bendig that Defendant remained ready, willing, and able to discuss a settlement of all claims without waiting for a ruling on the Motion for Summary Judgment. * * *
On May 6, 2002, Mr. Keener sent Mr. Bendig correspondence again indicating that Defendant was willing to discuss settlement. Mr. Keener noted that Plaintiff Jennifer Rothenbusch-Rhodes' treating physician did not recommend any further surgery and had further opined that treatment would reduce the appearance of her scar. * * * Mr. Bendig's response indicated his belief that the treating physician had actually stated that little could be done to improve the appearance of the scar. Mr. Bendig further indicated that Plaintiff Jennifer Rothenbusch-Rhodes found Defendant's counsel's minimization of her injury during the taking of her deposition to be infuriating and as a result, the hope of any settlement was reduced. However, Mr. Bendig then indicated that Plaintiffs were reluctantly willing to accept the sum of $500,000.00, but that their demand would be withdrawn upon a ruling being rendered on Defendant's Motion for Summary Judgment. * * *
Mr. Keener's reply stated that Mr. Bendig's righteous indignation over the questions asked during the deposition was misplaced and inappropriate as counsel was only fulfilling his duties in defending Defendant. Mr. Keener further indicated that Plaintiffs' demand was grossly inflated and not proportionate to Plaintiffs' actual compensatory damages when considering the prognosis for future recovery, medical expenses, and the fact that Plaintiff Jennifer Rothenbusch-Rhodes had no wage loss or impairment of earning ability. Mr. Keener stated that Defendant's settlement offer was $25,000.00, but that he would be willing to negotiate further. * * *
On May 13, 2002, the Court denied Defendant's Motion for Summary Judgment finding that reasonable minds could differ on the issue of punitive damages. On May 28, 2002, Mr. Bendig informed Mr. Keener that Plaintiffs' settlement demand was withdrawn and that Plaintiffs' intended to try the case. * * *
The Court ordered the parties to attend a mandatory mediation conference, which was scheduled for June 18, 2002. During the conference, Plaintiffs demanded $500,000.00 in compensatory damages and $100,000.00 in punitive damages. Defendant offered the sum of $25,000.00 for compensatory damages and $10,000.00 for punitive damages. Defendant refused to increase his offer unless Plaintiffs dramatically reduced their demand, which Plaintiffs were unwilling to do.
On the morning of trial, counsel participated in settlement discussions with the Court. Mr. Keener indicated that Defendant would not increase his offer unless Plaintiffs first lowered their demand below $100,000.00. Mr. Bendig found Defendant's position to be unreasonable, and thus, the case proceeded to trial.
Plaintiffs contend that the above facts demonstrate that they made a good faith effort to settle this case while Defendant did not. They argue that Defendant improperly characterized their injuries as being minor and inconsequential and further that his position regarding punitive damages was un-reasonable. In response, Defendant contends that the evidence demonstrates that he was the only one who initiated settlement discussion and that many of his attempts were rebuffed. He notes that Plaintiffs did not even make a settlement demand until ten months into this litigation and then withdrew that demand approximately three weeks later indicating that they intended to proceed with trial.
(Footnote omitted.)
 {¶ 93} Based upon the above-quoted factual findings, the trial court concluded:
Upon a careful review of the evidence and arguments presented, the Court finds that Plaintiffs have failed to demonstrate that Defendant failed to make a good faith effort to settle. Clearly, the parties and their counsel differed over the valuation of damages. Plaintiffs believed that their compensatory damages were well into the six-figure range and further that the potential for a large punitive damages award was great, whereas Defendant was of the mindset that Plaintiffs' compensatory damages were minimal and that punitive damages were not warranted. This was a case in which reasonable minds could differ as to a fair calculation of damages. It is conceivable that another jury could award Plaintiffs a million dollars, while another could realistically find that $50,000.00 was sufficient compensation.
Consequently, Plaintiffs cannot be faulted for being unwilling to reduce their demand, but Defendant certainly cannot be penalized for refusing to increase his offer, especially since there is absolutely no evidence that he did not act in good faith. * * *
 {¶ 94} According to plaintiffs, defendant's offer of $25,000 for compensatory damages and $10,000 for punitive damages cannot be viewed as a good faith settlement proposal. According to plaintiffs, defendant's negotiating strategy of refusing to move from his $25,000/$10,000 offer until plaintiffs reduced their demand below $100,000 was conclusive proof of an absence of good faith negotiations. We disagree.
 {¶ 95} Plaintiffs argument suggests that we view defendant's $25,000/$10,000 offer in isolation from the context of the negotiations which the trial court has succinctly set forth. We find that the trial court adequately explained why the motion for an award of prejudgment interest was denied. We find no abuse of discretion in the trial court's decision.
 {¶ 96} Plaintiffs' single assignment of error on cross-appeal is overruled.
 {¶ 97} All assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
PETREE, P.J., and BOWMAN, J., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.